DECISION ON OBJECTIONS TO THE MAGISTRATE'S DECISION
{¶ 1} Relator, Advantage Tank Lines, filed this original action in mandamus. Pursuant to Civ.R. 53 and Loc.R. 12(M) of the Tenth District Court of Appeals, the matter was referred to a magistrate of this court. On February 20, 2004, the magistrate rendered his decision, including findings of fact and conclusions of law, wherein he recommended denial of the writ. (Attached as Appendix A.) Relator timely filed objections to the magistrate's decision, which objections are now before the court.
 {¶ 2} The legal question presented in this case is whether a workers' compensation claimant can permissibly receive an award of permanent partial disability ("PPD") compensation under R.C.4123.57 while concurrently receiving temporary total disability ("TTD") compensation under R.C. 4123.56 for the same allowed condition. For the reasons that follow, as well as those elucidated by the magistrate, we answer this query in the affirmative.
 {¶ 3} Respondent, Daniel Marshall ("the claimant"), sustained injuries in the course and scope of his employment with relator on February 22, 2001. Roughly one year later, the claimant filed his application for determination of percentage of PPD. Nine months after that, on December 16, 2002, he filed his motion for TTD compensation, seeking such compensation for the period certified by his treating physician; that is, from the date of injury through the estimated return-to-work date of June 30, 2003. This TTD motion was filed just six days after a staff hearing officer for respondent, Industrial Commission of Ohio ("the commission"), determined that the claimant has a permanent 41 percent whole person impairment.
 {¶ 4} The timing of the claimant's filings seeking compensation results in a procedural posture in which the claimant was, at the same time, seeking a determination that he was partially and permanently impaired as a result of both of his allowed conditions, and that he was totally and temporarily
disabled as a result of one of his allowed conditions. Relator argues that if the claimant was only temporarily disabled for purposes of R.C. 4123.56, then he could not have been, at the same time, permanently impaired to any degree as a result of the same condition.
 {¶ 5} The magistrate determined otherwise, based upon controlling case law, and upon the language and purposes of R.C.4123.56 and 4123.57. In its objections, relator argues that the magistrate erred in determining that the two awards in this case may be given concurrently, that the magistrate misapplied the law, that he did not adequately define the term "permanent" as it pertains to PPD, and that he did not make any findings or conclusions that support the commission's determination that the claimant had sustained any permanent partial disability.
 {¶ 6} We find that the magistrate did set forth the meaning of "permanent" as it relates to PPD, correctly applied the law and made adequate and appropriate findings supporting his recommendation of denial of a writ of mandamus. The magistrate cited to the case of State ex rel. Kaska v. Indus. Comm.
(1992), 63 Ohio St.3d 743, 591 N.E.2d 235, in which the Supreme Court of Ohio held that prior PPD awards do not preclude later TTD compensation based on the same allowed conditions. The court noted that R.C. 4123.56 and 4123.57 do not indicate whether a PPD award will preclude later receipt of TTD compensation. It further noted that the only contemporaneous reference to these two statutes specifies that PPD awards are to be in addition to TTD compensation paid for the same injuries. In Kaska, the court rejected the argument that the "permanency" of a claimant's impairment somehow precludes a finding that the claimant is temporarily and totally disabled as a result of the same allowed conditions.
 {¶ 7} Though the chronology involved in Kaska was different from the present case (because in Kaska the claimant did not move for TTD compensation until after he had already received his PPD award), we think the rationale of Kaska applies with equal force herein. Like the employer in Kaska, relator herein argues that the "permanency" associated with PPD compensation is incongruent with the "temporariness" of the disability for purposes of TTD compensation. However, as the court in Kaska
held, and as the magistrate set forth in his decision herein, "permanency" for purposes of PPD relates to the fact that the claimant is physically changed and impaired in some permanent way, notwithstanding his ability or inability to return to work at the time; whereas "temporary" for purposes of TTD compensation relates to the fact that, due to the effects of the ongoing healing and recovery process, the claimant is unable to return to his former position of employment for a finite period of time. These concepts are not incongruent, though, at first blush, the verbiage used in describing them may make them appear so.
 {¶ 8} The harmony of these concepts is more evident upon a review of the character and purposes of PPD awards and TTD compensation. As the Kaska court noted, TTD compensation involves exclusively work-prohibitive disabilities. Id. at 746. PPD compensation, on the other hand, is not tied to whether a claimant can return to his former position of employment, or to another position within certain restrictions. PPD compensation may be received by a working claimant. This is because, as this court noted in State ex rel. Matlack v. Indus. Comm. (1991),73 Ohio App.3d 648, 598 N.E.2d 121, a claimant's condition may be permanent in the sense that the claimant's body, "has been changed and will not return to the exact state prior to the onset of the injury or disease." Id. at 658. But this "permanency" does not preclude a finding that the same claimant is "temporarily" unable to resume his former duties as a result of the same injury or disease, for purposes of TTD compensation.
 {¶ 9} Moreover, TTD compensation is intended to compensate for loss of ongoing earnings, whereas PPD compensation is intended to compensate for impairment of earning capacity occasioned by a permanent condition. State ex rel. Ramirez v.Indus. Comm. (1982), 69 Ohio St.2d 630, 433 N.E.2d 586; Stateex rel. Bunch v. Indus. Comm. (1980), 62 Ohio St.2d 423, 427,406 N.E.2d 815. Viewed this way, PPD compensation is more akin to a personal injury award designed to compensate for a permanent impairment that affects not only the claimant's working life but also his life outside the workplace. It is separate and distinct from any total income loss occasioned by a temporary inability to return to work.
 {¶ 10} In fact, R.C. 4123.57(B) includes a schedule of PPD compensation formulas that vary according to each enumerated permanent impairment. The statute specifies different formulas for, inter alia, loss of a thumb and each of the other digits, as well as portions of digits, loss of particular bones, loss of limbs and appendages and portions thereof, and loss of sight or hearing. In addition, like personal injury awards, provision is made for lump sum payments and payments through structured settlements. See Ohio Adm. Code 4121-3-15. Furthermore, unlike TTD compensation, any PPD compensation awarded but not yet paid upon the death of the claimant, continues to be paid to the claimant's surviving spouse or other heirs. R.C. 4123.57(B); Ohio Adm. Code4121-3-15.
 {¶ 11} We perceive no inconsonance when a claimant, who is determined to be otherwise eligible for both forms of compensation, receives a PPD award concurrently with TTD compensation for the same allowed condition.
 {¶ 12} In its objections, relator also argues that, "the Magistrate erred in finding that the Industrial Commission Orders, which awarded the claimant a 41 percent PPD award, were supported by `some evidence.'" (Objections of relator, at 5.) Specifically, relator argues that Dr. Skillings' report, upon which the commission relied in awarding PPD compensation, does not demonstrate the required permanency of the claimant's impairment. We note, however, that in its complaint relator did not allege that the commission's order was unsupported by "some evidence" based on any deficiency in Dr. Skillings' report. Furthermore, relator did not make this argument to the magistrate in its brief, and the magistrate never made a finding regarding the soundness of Dr. Skillings' report. Because this issue is being raised for the first time on objections to the magistrate's decision, and does not appear in the complaint, the same is not properly before this court.
 {¶ 13} After an examination of the magistrate's decision, an independent review pursuant to Civ.R. 53, and due consideration of relator's objections, we overrule the objections and find that the magistrate correctly determined the issues raised. Accordingly, we adopt the magistrate's decision as our own, including the findings of fact and conclusions of law contained therein, and deny relator's request for a writ of mandamus.
Objections overruled; writ denied.
Petree and Klatt, JJ., concur.
 APPENDIX A IN THE COURT OF APPEALS OF OHIO TENTH APPELLATE DISTRICT
State of Ohio ex rel. : Advantage Tank Lines, : Relator, : v. : No. 03AP-584 Industrial Commission of Ohio : (REGULAR CALENDAR) and Daniel Marshall, : Respondents. :
 MAGISTRATE'S DECISION IN MANDAMUS Rendered on February 20, 2004 Buckingham, Doolittle Burroughs, and Tod T. Morrow, for relator.
Jim Petro, Attorney General, and Dennis H. Behm, for respondent Industrial Commission of Ohio.
 {¶ 14} In this original action, relator, Advantage Tank Lines, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its orders awarding respondent Daniel Marshall ("claimant") R.C. 4123.57(A) permanent partial disability ("PPD") compensation and R.C. 4123.56(A) temporary total disability ("TTD") compensation and to enter orders denying those compensations.
Findings of Fact:
 {¶ 15} 1. On February 22, 2001, claimant sustained an industrial injury while driving a gasoline tanker truck for relator, a self-insured employer under Ohio's workers' compensation laws. On that date, claimant's tanker truck was involved in a collision with a school bus. The industrial claim is allowed for: "cervical strain; thoracic strain; post-traumatic stress disorder," and is assigned claim number 01-810726.
 {¶ 16} 2. On January 8, 2002, claimant filed an application for the determination of his percentage of PPD.
 {¶ 17} 3. On March 29, 2002, claimant's attending physician, Robert W. Esselstein, M.D., certified a period of TTD on a C-84 based upon claimant's post-traumatic stress disorder. On the C-84, Dr. Esselstein indicated that the disability dates were from "6/2000 [sic]" to "present." March 12, 2002 was given as the last date of examination. The C-84 form asks the attending physician to indicate by marking a box whether the injury has reached maximum medical improvement ("MMI"). Dr. Esselstein failed to mark either the "yes" or "no" box.
 {¶ 18} 4. The corresponding C-84 "Request for Temporary Total Compensation" was completed and signed by claimant on March 12, 2002.
 {¶ 19} 5. Claimant's January 8, 2002 application for PPD compensation prompted the Ohio Bureau of Workers' Compensation ("bureau") to schedule claimant for two medical examinations — one to be performed by psychologist Ralph Skillings, Ph.D. — the other to be performed by Herbert A. Grodner, M.D.
 {¶ 20} 6. On April 9, 2002, claimant was examined by Dr. Skillings who issued a report stating:
* * * Has the injured worker sustained a percentage of permanent partial impairment as a result of the allowed injury/ICD codes listed below? Please use the most recent edition of the AMA guides to the Evaluation of Permanent Impairment. * * * Please limit your opinion to impairment factors only and state these in a whole number as impair-ment to the whole body.
The 5th Ed of the AMA Guides to the Evaluation of Permanent Impairment was utilized to determine the percentage of impairment. Based upon medical evidence and exam findings associated with the allowed psychological condition this worker demonstrates impairment at the 28% low moderate level. This determination takes into account the severity of symptoms, duration of impairment, and the impact that his psychological disorder has had and is continuing to have on his daily life.
 {¶ 21} 7. On April 24, 2002, claimant was examined by Dr. Grodner for the allowed physical conditions of the claim. Dr. Grodner wrote:
Based on the history, present complaints, physical examination findings today, AMA Guides and information provided by the Bureau of Workers' Compensation, it is my opinion the claimant demonstrates ten (10) percent impair-ment to the whole person presently.
 {¶ 22} 8. On May 13, 2002, Dr. Bertram, a bureau physician, reviewed the reports of Drs. Grodner and Skillings. On a "Physician Review Sheet," Dr. Bertram combined the percentage findings of Drs. Grodner and Skillings to obtain a combined value of 35 percent.
 {¶ 23} 9. On May 17, 2002, the bureau mailed a tentative order awarding claimant 35 percent PPD based upon Dr. Bertram's report. Relator timely objected to the tentative order.
 {¶ 24} 10. On July 1, 2002, at claimant's request, claimant was examined by Nancy Renneker, M.D., for the allowed physical conditions and by psychologist Meleesa A. Hunt, Ph.D., for the post-traumatic stress disorder.
 {¶ 25} 11. Dr. Renneker reported:
Based on the 5th edition of the AMA Guides to the Evaluation of Permanent Impairment, Daniel Marshall has a 29% whole person impairment due to: (A) DRE Cervical Spine Category IV represents a 25% whole person impairment. Daniel Marshall meets the criteria of cervical spine Category IV due to alteration of motion segment integrity as Daniel Marshall is status post anterior C4-5 fusion in treatment of this injury and (B) DRE Thoracic Spine Category II represents an additional 5% whole person impairment, for a combined total 29% whole person impairment for this injury.
 {¶ 26} 12. Dr. Hunt reported:
Today's assessment is consistent with Mr. Marshall's previously allowed diagnosis of Post Traumatic Stress Disorder. With reference to the AMA Guides to the Evaluation of Permanent Impairment — Fifth Edition, Mr. Marshall's level of impairment on a psychological basis alone, with consideration only to the allowed condition of Post Traumatic Stress Disorder, is estimated to be at a Level 3, Moderate Range. With reference to previous AMA Guides, the percentage of impairment on a psychological basis alone directly related to the Industrial injury is estimated at 30%. * * *
 {¶ 27} 13. Claimant was examined at relator's request by Kenneth A. Writesel, D.O., for the allowed physical conditions on July 3, 2002, and by psychologist Roberto Madrigal, Ph.D., on July 26, 2002.
 {¶ 28} 14. Dr. Writesel's report, dated July 15, 2002, states:
Utilizing the American Medical Association's Guides to theEvaluation of Permanent Impairment, Fifth Edition, in my opinion the claimant has the following impairment findings:
Mr. Marshall has findings consistent with DRE cervical Category III inasmuch as the claimant had clinically significant radiculopathy verified by imaging studies that demonstrated a herniated disc at a level at the site expected from objective physical findings with radiculopathy that improved/resolved following surgery. In my opinion, this is equal to a 10% impairment of the whole person based on this allowed condition.
Relative to the condition of thoracic strain/sprain, in my opinion the claimant has findings consistent with DRE thoracic Category I with a 0% impairment of the whole person as there were no significant clinical findings, no muscular guarding, no documentable neurological impair-ment, no significant loss of motion segment integrity, and no other indication of impairment related to this injury. Again, this [is] a 0% impairment of the whole person.
Therefore, in my opinion, based on the allowed physical conditions in this claim, Mr. Marshall has a 10% whole person impairment rating.
(Emphasis sic.)
 {¶ 29} 15. Dr. Madrigal's report, dated July 27, 2002 states:
Given the results of this evaluation and the evidence submitted, it is my opinion that solely as a result of his allowed psychological condition of Post Traumatic Stress Disorder, claimant suffers from a 10% partial permanent impairment. This is following the AMA Guidelines for the Evaluation of Permanent Impairment V edition
 {¶ 30} 16. On August 20, 2002, at relator's request, Dr. Writesel issued an addendum report stating:
* * * [B]ased upon my examination and review of the report of 7/27/02 from Dr. Madrigal, and utilizing the American Medical Association's Guides to the Evaluation of Permanent Impairment,
Fifth Edition, in my opinion the claimant has sustained a permanent partial impairment rating of 10% based on the physical conditions in this claim and a 10% rating based on the psychological condition in the claim. Therefore, the combined whole person impairment rating for all of the conditions associated with the above-referenced claim would be 20%.
(Emphasis sic.)
 {¶ 31} 17. Following an August 28, 2002 hearing, a district hearing officer ("DHO") issued an order awarding claimant 41 percent PPD. The DHO's order explains:
This order is based upon the report[s] of Dr(s). Skillings, Grodner, Writsel [sic], Madrigal, Renneker and Hunt.
* * *
Please note this award represents 18% physical impairment and 23% psychological impairment.
 {¶ 32} 18. Relator filed an application for reconsideration of the DHO's order pursuant to R.C. 4123.57(A). Following an October 9, 2002 hearing, a staff hearing officer ("SHO") issued an order that affirmed the DHO's order. The SHO's order states:
This order is based upon the report[s] of Dr(s). Skillings, Grodner, Writsel [sic], Madrigal, Renneker, and Hunt.
 {¶ 33} 19. On October 25, 2002, relator filed a request for reconsideration of the October 9, 2002 SHO's order. On December 10, 2002, the commission mailed an order denying relator's request for reconsideration.
 {¶ 34} 20. On December 16, 2002, claimant moved for the payment of TTD compensation. In support, claimant submitted a C-84 from Dr. Esselstein dated October 2, 2002. On the C-84, Dr. Esselstein certified a period of TTD beginning "2-2-01 [sic]" (date of injury?) to an estimated return-to-work date of June 30, 2003. The TTD certification was based upon the post-traumatic stress disorder. In response to the query as to whether the injury had reached MMI, Dr. Esselstein marked the "no" box.
 {¶ 35} 21. In further support of his December 16, 2002 motion for TTD compensation, claimant submitted a narrative report, dated October 23, 2002, from Dr. Esselstein stating:
Findings Related to PTSD. The accident was an event that posed a threat of death to the patient. The patient's response to the accident was one of horror especially relating to the fear that the children in the school bus involved in the accident might have been injured or killed. The patient also experiences persistent avoidance of the stimuli in that the patient is very reluctant to drive. As a result the patient has experienced impairment in important areas of functioning especially that of employment.
Basis of Opinion That Patient Cannot Work Due to PTSD. Patient is experiencing headaches, sleep disturbance with recurrent dreams about the accident occurring two to three times per week, headaches, nervousness when he sees school buses, and the patient still avoids driving. The symptoms have remained even after some therapy at the Columbus Traumatic Stress Center. The patient is also experiencing physical pain in his ankle which seems that it would impede his ability to drive. Given these symptoms and physical pain, it is my opinion that the patient is unable to work and has been unable to work since February 2001.
 {¶ 36} 22. Following a February 3, 2003 hearing, a DHO issued an order granting TTD compensation. The DHO's order states:
Self-insured is directed to please pay temporary total benefits from 10/24/2002 (day after living maintenance ended in claimant's 2000 claim) to 02/03/2003 (date of hearing) and continuing upon submission of medical evidence supporting temporary total disability.
District Hearing Officer finds claimant's psychological condition renders him temporary totally disabled.
District Hearing Officer further finds claimant is not
maximum medically improved. There is no medical report on file opining that claimant is maximum medical improved. Self insured argues such a finding can be inferred from the permanent partial disability exam by Dr. Skillings (04/09/-2002). While District Hearing Officer agrees with self insured's argument that it is legally possible to find someone maximum medically improved without those "magic words" appearing in any report, in this particular case self insured has failed to prove claimant is maximum medically improved.
(Emphasis sic.)
 {¶ 37} 23. Relator administratively appealed the DHO's order of February 3, 2003.
 {¶ 38} 24. Following a March 6, 2003 hearing, an SHO issued an order stating that the DHO's order is affirmed. The SHO's order states:
Payment remains correctly ordered for temporary total compensation for the period of 02/24/2002 to 02/03/2003 and to continue upon submission of proof. * * *
 {¶ 39} 25. On April 4, 2003, another SHO mailed an order refusing relator's administrative appeal from the SHO's order of March 6, 2003.
 {¶ 40} 26. On June 11, 2003, relator, Advantage Tank Lines, filed this mandamus action.
Conclusions of Law:
 {¶ 41} Two main issues are presented: (1) whether Dr. Esselstein's March 29, 2002 and October 2, 2002 certifications of TTD precluded claimant's entitlement to an award of PPD compensation; and (2) whether TTD compensation bars contem-poraneous or concurrent receipt of PPD compensation.
 {¶ 42} The magistrate finds: (1) Dr. Esselstein's TTD certifications did not preclude claimant's entitlement to the PPD award; and (2) TTD compensation does not bar contemporaneous or concurrent receipt of PPD compensation as long as claimant was eligible to file the PPD application. Accordingly, it is the magistrate's decision that this court deny relator's request for a writ of mandamus, as more fully explained below.
 {¶ 43} Turning to the first issue, in State ex rel. Kaska v.Indus. Comm. (1992), 63 Ohio St.3d 743, 745-746, the court states:
Appellant contends that * * * the "permanency" element of a permanent partial disability award is sufficient to preclude receipt of temporary total disability compensation. This argument, however, necessarily assumes that" permanent," as used in former R.C. 4123.57 has the same meaning as that term is used in [State ex rel. Ramirez v. Indus. Comm. (1982),69 Ohio St.2d 630]. We find otherwise.
For our purposes herein, "permanent" is not statutorily defined. (The definition of "maximum medical improvement" implemented by Am. S.B. No. 307 and R.C. 4123.56 post-dates claimant's injury.) We defined "permanency," however, as used inRamirez, as "a condition that will, `* * * with reasonable probability, continue for an indefinite period of time without any present indication of recovery therefrom.'" VulcanMaterials Co. v. Indus. Comm. (1986), 25 Ohio St.3d 31, 33
* * *.
Previously, the Franklin County Court of Appeals held that" permanency" is subject to differing interpretations. Perhaps cognizant of the dangers of using the term" permanent" too loosely, the court wrote that:
"* * * [A] distinction exists between the permanency involved in a permanent partial disability award, and that considered in making an award of temporary total disability compensation."State, ex rel. Schafer, v. Indus. Comm. (Mar. 28, 1989), Franklin App. No. 88AP-130, unreported, at 5 * * *.
We recently moved in Schafer's direction in State, ex rel.Bing, v. Indus. Comm. (1991), 61 Ohio St.3d 424 * * * by stating:
"While Bing's injury may be permanent in the sense that she will continue to have back troubles in the future, it is not `permanent' in the Ramirez sense * * *." Id. at 426 * * *.
Bing, while not specifically distinguishing between permanent partial disability "permanency," and temporary total disability compensation "permanency," inferred that the term "permanency" may have a unique meaning as used in Ramirez. This conclusion is not without precedent. Workers' compensation law uses specialized terms of art whose meanings can vary depending on context. "Totality," for example, has one meaning when used to discuss permanent total disability; it means something else where temporary total disability is involved. Permanent total
disability requires a claimant to demonstrate an inability to perform sustained remunerative employment. State, ex rel.Jennings, v. Indus. Comm. (1982), 1 Ohio St.3d 101 * * *. Temporary total disability, on the other hand, requires only an inability to return to the former position of employment.Ramirez, supra.
There are other reasons for distinguishing between permanent partial disability "permanency" and Ramirez" permanency." First, temporary total disability compensation involves exclusively work-prohibitive disabilities, see Ramirez, supra,
at syllabus, whereas permanent partial disability does not. More significantly, unlike "permanency" which is a precondition toreceipt of permanent partial benefits, temporary total disability "permanency" is a termination criterion. The latter supplies compelling justification for ensuring that temporary total disability compensation is not terminated on a "permanency basis" unless there is a clear indication that the claimant's condition will not improve. See Vulcan, supra.
* * *
Thus, where "permanency" appears in a context other than temporary total disability — as occurred here with the earlier permanent partial disability awards — we will not auto-matically assume that such term is referring to "permanency" in the specialized Ramirez sense. * * *
(Emphasis sic.)
 {¶ 44} The Kaska court's pronouncement is reinforced by an earlier decision from this court in State ex rel. Matlack, Inc.v. Indus. Comm. (1991), 73 Ohio App.3d 648, 658, wherein this court states:
* * * To be sure, almost all injuries or diseases are permanent and irreversible in the sense that the body has been changed and will not return to the exact state prior to the onset of the injury or disease. But MMI is based on the concept of recuperation or healing. It is the time period, based on reasonable medical judgment, in which the claimant is brought back to some level of stabilization or plateau. The fact that this level is less than claimant's pre-injury condition does not mean the claimant's condition is permanent from the inception.
 {¶ 45} It follows from Kaska, that Dr. Esselstein's March 29, 2002 and October 2, 2002 certifications of TTD which, by inference or by direct statement, indicate that the post-traumatic stress disorder was not at MMI during the periods being certified, are not inconsistent with the commission's PPD award which is premised upon medical reports stating that claimant suffers a percentage of permanent impairment. See, also,State ex rel. Pleban v. Indus. Comm. (1997), 78 Ohio St.3d 406
(a case applying Kaska).
 {¶ 46} Relator here incorrectly attempts to equate theRamirez permanency concept (MMI) with the permanency concept of PPD. As Kaska and its progeny make clear, those two concepts are not equatable. Hence, it is not at all inconsistent that the industrial injury produces a percentage of PPD and has not reached Ramirez permanency (MMI).
 {¶ 47} Turning to the second issue, R.C. 4123.57(A) provides for permanent partial disability awards. R.C. 4123.57(A) is preceded by the following paragraph:
Except as provided in this section, not earlier than forty weeks after the date of termination of the latest period of payments under section 4123.56 of the Revised Code, or not earlier than forty weeks after the date of the injury or contraction of an occupational disease in the absence of payments under section 4123.56 of the Revised Code, the employee may file an application with the bureau of workers' compensation for the determination of the percentage of the employee's permanent partial disability resulting from an injury or occupational disease.
R.C. 4123.57(C) states, in part:
Compensation for partial impairment under divisions (A) and (B) of this section is in addition to the compensation paid the employee pursuant to section 4123.56 of the Revised Code. * * *
Here, relator concedes that claimant was eligible to file his application for PPD compensation under the 40-day rule set forth at R.C. 4123.57. See, State ex rel. Burrows v. Indus. Comm.
(1997), 78 Ohio St.3d 78.
 {¶ 48} Nevertheless, relator asserts that a claimant cannot be "contempor-aneously" eligible for both PPD and TTD compensation. (See relator's reply brief at 3.) Relator seems to suggest that this is so because allegedly "[a] disability is either temporary or permanent, but it cannot be both." Id.Kaska clearly undermines relator's assertion. Contrary to relator's assertion or suggestion, an industrial injury can produce a permanent partial disability yet remain temporary in the Ramirez sense.
 {¶ 49} Moreover, the language of current R.C. 4123.57(C), formerly R.C. 4123.57(D), strongly suggests that there is no bar to claimant's retention of both awards. In State ex rel. Murrayv. Indus. Comm. (1992), 63 Ohio St.3d 473, 475, the court held that a claimant cannot simultaneously receive PPD compensation and permanent total disability (PTD) compensation. In reaching its holding, the Murray court looked at former R.C. 4123.57(D) and stated:
The former versions of R.C. 4123.57(D), applicable at the time of claimant's injuries herein, elaborately specify that compensation for partial disability under former R.C. 4123.57(B) shall be in addition to compensation for periods of temporary total disability. Reference to concurrent payment of PPD and PTD benefits is conspicuously absent. * * *
It follows from the Murray court analysis that current R.C.4123.57(C)'s provision that PPD compensation is "in addition to" TTD compensation must be viewed as significant for what it says and for what it does not say.
 {¶ 50} Accordingly, because the instant claimant met the 40-day eligibility provision for filing his PPD application, he is entitled to keep his PPD award notwithstanding that he was later awarded TTD compensation for a period when he was examined by physicians whose reports were relied upon to support the PPD award. Murray.
 {¶ 51} Accordingly, for all the above reasons, it is this magistrate's decision that this court deny relator's request for a writ of mandamus.
 /s/ Kenneth W. Macke
KENNETH W. MACKE MAGISTRATE